1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,    )
                             )
            Plaintiff        )
        vs                   )    16-CR-254
                             )
DAVID D. KLEPADLO,           )
                             )
            Defendant        )
_____)
```

TRANSCRIPT OF PROCEEDINGS
SENTENCING OBJECTIONS
BEFORE THE HONORABLE A. RICHARD CAPUTO
MONDAY, SEPTEMBER 30, 2019; 10:00 A.M.
WILKES-BARRE, PENNSYLVANIA

FOR THE GOVERNMENT:
    MICHELLE OLSHEFSKI, ESQ.
    Assistant United States Attorney
    P.O. Box 309
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503
-AND-
    WARREN M. HARRELL, ESQ.
    U.S. Environmental Protection Agency
    1650 Arch Street
    Philadelphia, Pennsylvania  19103

FOR THE DEFENDANT:
    MARK B. SHEPPARD, ESQ.
    Klehr Harrison Harvey Branzburg LLP
    1835 Market Street, Suite 1400
    Philadelphia, Pennsylvania  19103
-AND-
    TIMOTHY J. BERGERE, ESQ.
    Montgomery, McCracken, Walker & Rhoads, LLP
    1735 Market Street, 21st Floor
    Philadelphia, Pennsylvania  19103-7506

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

10:05AM 1    THE COURT:  As far as today's sentencing concerned, there

10:05AM 2 are multiple objections that need to be resolved, and frankly,

10:05AM 3 there's a lot of documents that have come along lately. So what

10:05AM 4 we're going to do today is we will deal with the objections and

10:05AM 5 we're going to reschedule this sentencing for another day.

10:05AM 6    But we will deal with the objections, and we will see where

10:05AM 7 we are at the end of that. I may or may not make a ruling on

10:05AM 8 that now or issue an opinion regarding same. I don't know which

10:05AM 9 way we're going to go. This hearing will determine where we are

10:05AM 10 at that point. Okay?

10:05AM 11    MR. SHEPPARD: Yes, Your Honor.

10:05AM 12    THE COURT: There is two sentencing memoranda, a

10:05AM 13 Pre-Sentence Report regarding this offense, one on

10:06AM 14 behalf -- one regarding Mr. Klepadlo and the other the

10:06AM 15 corporation, and there have been a variety of documents

10:06AM 16 submitted, the sentencing memoranda also I received, but

10:06AM 17 there's a Board Resolution of Greenfield Township Sewer

10:06AM 18 Authority. Does everybody have a copy of that?

10:06AM 19    MR. SHEPPARD: I received it this morning, Your Honor?

10:06AM 20    THE COURT: As did I.

10:06AM 21    MS. OLSHEFSKI: Yes, Your Honor.

10:06AM 22    THE COURT: So let's deal with the objections that have been

10:06AM 23 filed.

10:06AM 24    Essentially, the major objection is the question involving

10:07AM 25 Paragraph 24 of the Pre-Sentence Report, which is the inclusion

10:07AM 1 of the enhancement for toxic substances, and I'll hear from

10:07AM 2 counsel Mr. Sheppard regarding their position.

10:07AM 3     MR. SHEPPARD: Yes, good morning, Your Honor. Mark Sheppard

10:07AM 4 on behalf of David Klepadlo. With me is my co-counsel Tim

10:07AM 5 Bergere and the newly admitted Ms. Lowry.

10:07AM 6     Your Honor, if I may, just as a matter of housekeeping, we

10:07AM 7 got the amended PSR, I guess, late Thursday or Friday. There is

10:07AM 8 just two factual corrections that I have spoken with the

10:07AM 9 Probation Officer about, I'd like to get it on the record, just

10:07AM 10 so we have a clean record with regard to that.

10:07AM 11     Your Honor, I would direct the Court to Paragraph 62 on

10:08AM 12 Page 15 of the amended PSR.

10:08AM 13     THE COURT: All right.

10:08AM 14     MR. SHEPPARD: Your Honor, there, there's a paragraph at the

10:08AM 15 bottom that relates to the income of the Defendant's business,

10:08AM 16 David D. Klepadlo and Associates, which also has pled guilty to

10:08AM 17 the one count of filing false statements.

10:08AM 18     Your Honor, I simply wish to point out that the income

10:08AM 19 numbers that are reported there are gross income numbers. I

10:08AM 20 confirmed that with Mr. Zdaniewicz, and, Your Honor, the net

10:08AM 21 income number for 2017, which reported a gross amount of

10:08AM 22 $67,116, was actually $5240, based upon the tax return that was

10:08AM 23 filed.

10:08AM 24     And, Your Honor, they're not stated there, but in 2018, the

10:09AM 25 Defendant reported gross income through his business of $12,000

10:09AM 1   and reported a net loss of $8,000. And as noted in the

10:09AM 2   objections, which were attached to the addendum, Your Honor,

10:09AM 3   that was primarily as a result of the fact that the consulting

10:09AM 4   business, David Klepadlo and Associates, voluntarily

10:09AM 5   relinquished -- Mr. Klepadlo voluntarily relinquished his

10:09AM 6   Certificate to be a Sewage Treatment Plant Operator, pursuant

10:09AM 7   to the plea agreement, and, therefore, lost all four of the

10:09AM 8   contracts that he had. So there was very limited income coming

10:09AM 9   into the business, and I wanted to point that out.

10:09AM 10         The other objection, Your Honor, that factually needed to

10:09AM 11  be resolved is with regard to Paragraph 63 on the next page,

10:09AM 12  which is the Defendant's Statement of Assets. This is just a

10:09AM 13  typographical error, and I apologize to Mr. Zdaniewicz because

10:09AM 14  I didn't point it out sooner, the asset numbers there and also

10:09AM 15  the income numbers there, Your Honor, are numbers for Mr.

10:10AM 16  Klepadlo's entire household, both he and his wife.

10:10AM 17         You would note, Your Honor, that on the income numbers,

10:10AM 18  there's actually a line item for Linda Klepadlo's income at the

10:10AM 19  top of Page 17.

10:10AM 20         Again, I spoke with the Probation Officer about that this

10:10AM 21  morning, and he concurs that these are, in fact, numbers for

10:10AM 22  both Mr. Klepadlo and his wife. Just so the record is clear and

10:10AM 23  the PSR is accurate, Your Honor. I don't expect that we are

10:10AM 24  going to ultimately be -- depending where the guideline range

10:10AM 25  comes out and, ultimately, what the Court decides, with regard

10:10AM **1** to this restitution issue -- it may or may not become a

10:10AM **2** question of the ability to pay.

10:10AM **3**     THE COURT: So the statement that the amounts reflect Mr.

10:10AM **4** Klepadlo's one-half interest is not so?

10:10AM **5**     MR. SHEPPARD: That is correct, Your Honor, it is their

10:10AM **6** joint interest.

10:10AM **7**     THE COURT: All right.

10:10AM **8**     MR. SHEPPARD: So I think if you add the word, not, Your

10:11AM **9** Honor, I think we're good to go.

10:11AM **10**     THE COURT: Thank you.

10:11AM **11**     MR. SHEPPARD: So those were the only factual objections we

10:11AM **12** had, Your Honor, to the amended Pre-Sentence Report. And as

10:11AM **13** Your Honor pointed out, we do have a number of legal objections

10:11AM **14** to the guideline computation.

10:11AM **15**     THE COURT: Let's deal with those.

10:11AM **16**     MR. SHEPPARD: Thank you, Your Honor. With regard to the

10:11AM **17** first issue, as Your Honor pointed out, the issue is the

10:11AM **18** application of the guideline range here, whether it's 2(q)1.2,

10:11AM **19** which relates to discharges for toxic and hazardous substances

10:11AM **20** or 2(q)1.3, which relates to the discharge of a pollutant, in

10:11AM **21** violation of a permit. Both of these offenses also address the

10:11AM **22** record-keeping offense to which Mr. Klepadlo and the entity

10:11AM **23** pled guilty.

10:11AM **24**     Your Honor, as we stated in our Sentencing Memo and also in

10:11AM **25** the objections that were attached to the PSR, it is our

10:11AM 1  position that the proper guideline is 2(q)1.3. And, Your Honor,

10:11AM 2  the reason that it's important is it's a base offense level of

10:12AM 3  6 versus a base offense level of 8 for the toxic and hazardous

10:12AM 4  substance.

10:12AM 5      Your Honor, the argument that we have set forth is,

10:12AM 6  essentially, that the Court needs to look to the count of

10:12AM 7  conviction in deciding the guideline range, and that the

10:12AM 8  statutory basis and the basis for the plea here, Your Honor,

10:12AM 9  is, essentially, that Mr. Klepadlo and the company have pled

10:12AM 10  guilty to filing false statements relating to the failure to

10:12AM 11  properly test daily for the items at the two plants, DO and pH.

10:12AM 12  And, also, at Benton Nicholson, I believe it was just pH.

10:12AM 13      Your Honor, it is our position that when you look at the

10:12AM 14  count of conviction here, you're talking about a discharge from

10:12AM 15  a sewage treatment plant, in violation of a permit because the

10:12AM 16  testing was not done, which does not, Your Honor, equate to the

10:12AM 17  discharge of a toxic or hazardous substance.

10:12AM 18      Your Honor, we would also make the argument under the Clean

10:13AM 19  Water Act, in response to the Government's position that

10:13AM 20  ammonia is a hazardous or toxic substance, that, number one,

10:13AM 21  under the Clean Water Act itself, which is the offense to which

10:13AM 22  he has pled guilty, ammonia is listed as a pollutant and not a

10:13AM 23  toxic or hazardous substance.

10:13AM 24      With regard to sewage treatment plants, themselves, we

10:13AM 25  argue that in every single case that we found, reported or

10:13AM 1  unreported in the country, that involved the discharge of

10:13AM 2  sewage from a sewage treatment plant, 2(q)1.3 was the guideline

10:13AM 3  that was applied.

10:13AM 4      And, Your Honor, the reason for that, we submit, is that

10:13AM 5  with regard to municipal waste, and, in particular, the

10:13AM 6  municipal waste that came from these two rather small plants,

10:13AM 7  ammonia and ammonia nitrogen -- and we do have Mr. Long here

10:13AM 8  who can testify to this -- Your Honor, are natural components

10:13AM 9  of sewage treatment. This is not a situation where you had a

10:14AM 10  discharge where someone was pouring ammonia into a stream or

10:14AM 11  that you were discharging from a toxic plant or that you were

10:14AM 12  discharging from a commercial plant.

10:14AM 13      Your Honor, the three cases that the Government relies

10:14AM 14  upon, we believe, are inapposite. One of them relates to lead

10:14AM 15  paint being discharged into a river. I don't think anyone is

10:14AM 16  going to argue that that's a toxic substance.

10:14AM 17      The other two, Your Honor, one related to discharges from a

10:14AM 18  slaughterhouse involving chicken processing. Again, I don't

10:14AM 19  believe anyone is going to argue that discharges from a chicken

10:14AM 20  slaughterhouse would involve toxic substances.

10:14AM 21      Here, Your Honor, we have a naturally-occurring component

10:14AM 22  of sewage treatment, every single sewage treatment plant in the

10:14AM 23  country, big or small, discharges ammonia nitrates or ammonia

10:14AM 24  nitrogen, and, therefore, Your Honor, to say that this offense

10:14AM 25  should be subject to the guideline which is reserved for the

10:15AM 1   most serious and hazardous and toxic discharges is a

10:15AM 2   substantial overstatement, and it overstates, frankly, the

10:15AM 3   seriousness of this offense.

10:15AM 4        Particularly, Your Honor, where we are talking about a

10:15AM 5   record-keeping violation, where Mr. Klepadlo has pled guilty to

10:15AM 6   the failure to monitor and oversee the proper testing at these

10:15AM 7   two facilities.

10:15AM 8        Your Honor, I would refer, also, to our memoranda, where we

10:15AM 9   cite a number of cases, at least, nine or ten separates places

10:15AM 10  where 2(q)1.3 was applied involving a sewage treatment plant or

10:15AM 11  the discharge of sewage, both either raw sewage or even treated

10:15AM 12  sewage. Again, Your Honor, that's an important point here. We

10:15AM 13  are talking about treating sewage coming out of these plants.

10:15AM 14  These are not untreated discharges.

10:15AM 15       So, again, Your Honor, under the Clean Water Act and, also,

10:15AM 16  given that we're talking about these sewage treatment plants,

10:16AM 17  we submit 2(q)1.3 is the proper guideline range.

10:16AM 18       THE COURT: All right. Counsel.

10:16AM 19       MR. HARRELL: Good morning, Your Honor. My name is Warren

10:16AM 20  Harrell, I'm a Special Assistant United States Attorney from

10:16AM 21  the United States Environmental Protection Office in

10:16AM 22  Philadelphia.

10:16AM 23       There's truly a question of law, here, to begin with. Is

10:16AM 24  ammonia a hazardous substance? The permits, in this case -- and

10:16AM 25  I'm pretty confident I agree with Mr. Sheppard --

10:16AM 1    THE COURT: I don't mean to interrupt you, but is there a

10:16AM 2    distinction between hazardous and toxic?

10:16AM 3    MR. HARRELL: Yes. It's not a toxic water pollutant, I agree

10:16AM 4    with Mr. Sheppard, it's been listed under the different section

10:16AM 5    of the Clean Water Act Section 311 as a hazardous substance.

10:16AM 6    It's on the list of hazardous substances in 40 CFR 302.4, I

10:16AM 7    believe is the correct cite, we have it in our sentencing memo.

10:17AM 8    So the legal question really is, is ammonia a hazardous

10:17AM 9    substance or isn't it? If it's a hazardous substance, then,

10:17AM 10   2(q)1.2 applies if the offense conduct in this case and the

10:17AM 11   relevant conduct involved the discharge of ammonia.

10:17AM 12   If you look at the indictment, the wide-ranging conspiracy

10:17AM 13   that was alleged in Count 1 and all the substantive Clean Water

10:17AM 14   Act charges have to do with, among other things, not taking

10:17AM 15   daily or weekly composite samples at both plants. Composite

10:17AM 16   samples were required for ammonia nitrogen.

10:17AM 17   Failure to operate the plant. We have a witness from DEP

10:17AM 18   who would talk about the effects of improper operation and the

10:17AM 19   actual discharge of these pollutants into the receiving waters

10:17AM 20   in this case at Greenfield and the tributary of Dundaff Creek.

10:17AM 21   So, legally, ammonia is a hazardous substance. The factual

10:17AM 22   question of whether it applies in this case, as we believe it

10:17AM 23   does, because the permit required the monitoring for ammonia

10:18AM 24   nitrogen, ammonia nitrogen was being discharged from the plant,

10:18AM 25   it wasn't being totally removed by the treatment system, and

10:18AM 1 whether the plant was discharging treated wastewater is a core

10:18AM 2 question that the parties disagree about because, you don't

10:18AM 3 show up for 116 days out of a little bit more than six months,

10:18AM 4 to actually have a human being at the plant, it's not going to

10:18AM 5 run properly.

10:18AM 6 　　　　So that's the Government's position.

10:18AM 7 　　　　THE COURT: So is there disagreement about whether or not

10:18AM 8 ammonia nitrate was a discharged or not? Is there agreement

10:18AM 9 about that?

10:18AM 10 　　　　MR. SHEPPARD: Your Honor, we are in agreement with that.

10:18AM 11 It is a permanent substance that is always discharged from

10:18AM 12 every sewage treatment plant. What we disagree about is whether

10:18AM 13 or not there were any exceedances, other than the ones our

10:18AM 14 client actually recorded, with regard to ammonia. And, Your

10:18AM 15 Honor, there is no evidence of any exceedances beyond the

10:19AM 16 permitted limits. The permits themselves, Your Honor, allow for

10:19AM 17 the discharge of ammonia nitrogen. They allow two different,

10:19AM 18 depending on the time of year.

10:19AM 19 　　　　Your Honor, our position is that the offense of conviction

10:19AM 20 here, the failure to oversee the proper testing and the

10:19AM 21 submission of false reports. Again, Mr. Klepadlo has not pled

10:19AM 22 guilty to a substantive violation here. This is a

10:19AM 23 record-keeping violation, and that was negotiated as part of

10:19AM 24 the plea agreement.

10:19AM 25 　　　　So, Your Honor, we don't disagree that ammonia nitrogen was

10:19AM 1   discharged, what we disagree about, Your Honor, is that it was

10:19AM 2   never discharged in any kind of harmful or dangerous amounts.

10:19AM 3   There is no evidence that there was any discharge in violation

10:19AM 4   of the permitted limits here.

10:19AM 5        So, Your Honor, our position is -- and I would cite the

10:19AM 6   Court specifically to --

10:19AM 7        THE COURT: Before you do that, let me get this straight. So

10:19AM 8   what we're saying -- what everyone is saying here is it was

10:19AM 9   discharged, but we don't know if there were any violations in

10:20AM 10  the discharge amount or intensity, because these tests or

10:20AM 11  records were not kept? Is that right? Am I phrasing that

10:20AM 12  properly?

10:20AM 13       MR. HARRELL: Yes, Your Honor. I would say it's impossible

10:20AM 14  to know if things were being discharged illegally, because he

10:20AM 15  wasn't doing the required testing and then lying to the DEP

10:20AM 16  about making up results.

10:20AM 17       THE COURT: But we're going a step further, aren't we? We're

10:20AM 18  saying, because those tests weren't done, you're concluding

10:20AM 19  that it was a violation, in terms of the amount that was

10:20AM 20  discharged?

10:20AM 21       MR. HARRELL: It was a violation of the permit not to do the

10:20AM 22  sampling. An effluent limit -- a numerical limit in the permit

10:20AM 23  is no different kind of permit requirement than the requirement

10:20AM 24  to do sampling, the required requirement to do operation and

10:21AM 25  maintenance, the requirement to honestly report data. They're

10:21AM 1 all core ingredients of the permit.

10:21AM 2     So the substantive violation here is not doing the

10:21AM 3 sampling, lying about the sampling, and I would just point out

10:21AM 4 that Mr. Long, the Defendant's expert, in his report, relies on

10:21AM 5 DEP sampling that was done at both plants between 2012 and

10:21AM 6 2016, which is only seven samples over a little bit more than

10:21AM 7 four years. Three of those seven samples showed exceedances of

10:21AM 8 the instantaneous max for ammonia.

10:21AM 9     So to say there's no evidence of illegal discharges is not

10:21AM 10 accurate.

10:21AM 11     MR. SHEPPARD: Your Honor, if I may respond, and then same

10:21AM 12 going to ask Mr. Bergere to respond to the last point because

10:21AM 13 it's an important one.

10:21AM 14     First off, Your Honor, under 1(b)1.2(a) of the guidelines,

10:21AM 15 the guidelines require that the count of conviction, not the

10:21AM 16 relevant conduct, be used to determine the offense guideline.

10:22AM 17 That is clear. What they're talking about here -- first off, I

10:22AM 18 don't agree that's relevant conduct for this offense, but

10:22AM 19 assuming that it is, you still need to look to the count of

10:22AM 20 conviction to make the determination under 1(b)1.2(a) of what

10:22AM 21 is the proper guideline range .

10:22AM 22     Your Honor, the offense of conviction, the statutory or the

10:22AM 23 factual basis for the plea was all about Mr. Klepadlo as a

10:22AM 24 responsible officer failing to oversee his employee, a

10:22AM 25 Certified Treatment Plant Operator to do the proper testing.

10:22AM 1  That's what he admitted to, as far back as 2013, to DEP, it's

10:22AM 2  what he admitted to to Mr. Wetland and Mr. Burgess, when they

10:22AM 3  interviewed him in 2015, even before these charges were filed,

10:22AM 4  and that's why he pled guilty. What he hasn't pled guilty to is

10:22AM 5  the substantive offenses that Mr. Harrell was talking about.

10:23AM 6       And under the guidelines, as a matter of law, you must look

10:23AM 7  to the count of conviction, unless there was a specific

10:23AM 8  stipulation to a guideline range, and, clearly, Your Honor,

10:23AM 9  that is not what occurred here. So that is one point, Your

10:23AM 10 Honor. I would cite the case Watterson v. United States. It's

10:23AM 11 on Page 10 of our sentencing memo.

10:23AM 12      The second point, Your Honor, is the argument that Mr.

10:23AM 13 Harrell makes about ammonia exceedances is just a little

10:23AM 14 misleading, because under the permit, Your Honor -- and Mr.

10:23AM 15 Bergere can explain this better than I can -- but under the

10:23AM 16 permit, Your Honor, this was a weekly composite sample of

10:23AM 17 ammonia that was supposed to be conducted, again, it was not

10:23AM 18 the daily sampling to which my client admitted they didn't do.

10:23AM 19      And, Your Honor, what they're talking about is an

10:23AM 20 instantaneous max, which is a grab sample, and that is

10:23AM 21 different from the sample that was required under the permit.

10:24AM 22 And Mr. Bergere can address that, Your Honor.

10:24AM 23      MR. BERGERE: Your Honor, that is fundamentally correct. The

10:24AM 24 permit, actually, has two limits for ammonia. There's a loading

10:24AM 25 on the screen that is calculated at the monthly average, and

10:24AM 1  the composite samples are taken weekly to determine whether

10:24AM 2  there's been an exceedance of monthly average. A grab sample

10:24AM 3  doesn't determine that. In fact, the limits under the permit

10:24AM 4  are less than the EPA and World Health Organization limits for

10:24AM 5  human exposure and drinking water, the limits of these permits.

10:24AM 6      So they don't translate to any kind of environmental harm

10:24AM 7  in the screening, which is the larger focus of Mr. Long's

10:24AM 8  testimony. He's focused more on, were these little exceedances

10:24AM 9  here and there a number of which were self-reported and which

10:24AM 10 were not untypical as grab samples of wastewater treatment

10:24AM 11 plants, did they cause environmental harm?

10:24AM 12     It's kind of like charging -- asking for an enhancement for

10:24AM 13 a bank robber because he had gasoline in his tank in his

10:25AM 14 get-away car and gasoline has benzene in it, so let's do an

10:25AM 15 enhancement because there's hazardous substances in his vehicle

10:25AM 16 and they came out in the exhaust.

10:25AM 17     Treatment plants operate all the time -- this is not a

10:25AM 18 manufacturing plant, they don't bring ammonia there, they don't

10:25AM 19 emit it, except in connection with the operation of the

10:25AM 20 treatment plant. And there's no samples that have been provided

10:25AM 21 that establish harm, even though, every once in a while, there

10:25AM 22 may have been an occasional exceedance with a grab sample,

10:25AM 23 which is not part of the loading and determination as to

10:25AM 24 whether there's any environmental harm involved from the

10:25AM 25 emission of or discharge of ammonia.

10:25AM 1    And the flow. The flow at this treatment plant is -- this

10:25AM 2 permit has authorized 140,000 gallons a day, the plant

10:25AM 3 discharges a fraction of that, perhaps, 40 at most, 60 percent

10:25AM 4 of that. So there's almost no chance -- in fact, the expert

10:25AM 5 would tell you -- there isn't a chance that the plant could

10:25AM 6 have exceeded any of the in-stream values that are set forth in

10:25AM 7 the permit.

10:25AM 8    THE COURT: All right.

10:26AM 9    MR. HARRELL: Your Honor, I'll just try not to repeat what I

10:26AM 10 said before, but the question you posed is whether 2(q)1.2

10:26AM 11 applies to this case. The question of harm is the guided

10:26AM 12 departure issue, which is down the road in the guidelines

10:26AM 13 analysis, but ammonia is a hazardous substance. The plant was

10:26AM 14 authorized to discharge ammonia within certain limits.

10:26AM 15    There's no question, no dispute that you heard that ammonia

10:26AM 16 was discharged here, and their sampling shows that there were

10:26AM 17 ammonia exceedances, and we don't know for many, many, many

10:26AM 18 days how the plant was operating and whether it was discharging

10:26AM 19 ammonia in excess of permitted limits, because there was no

10:26AM 20 sampling being done. Sampling reporting are just as much a

10:26AM 21 substantive part of the permit as numerical effluent. Thank

10:26AM 22 you, Your Honor.

10:26AM 23    MR. BERGERE: But as has been pointed out, and as pointed

10:26AM 24 out in the papers, 2(q)1.3 is the one that's typically applied

10:26AM 25 in sewage cases, because the Department, EPA and everybody else

10:27AM 1    treats sewage -- it's not -- these as non-conventional

10:27AM 2    pollutants in wastewater treatment plants, it's not a

10:27AM 3    manufacturing plant.

10:27AM 4        And the cases where 2(q)1.2 are applied are for industrial

10:27AM 5    discharges or other kinds of operations, the lead paint that we

10:27AM 6    talked about, they're really toxic discharges that those

10:27AM 7    provisions are used for those bad, really a lot of them

10:27AM 8    unpermitted, completely unpermitted discharges, and EPA is

10:27AM 9    asking to export that provision to apply to treatment plants,

10:27AM 10   which it's not done in the past and which the Courts have not

10:27AM 11   done in the past.

10:27AM 12       THE COURT: All right.

10:27AM 13       MR. SHEPPARD: One more point, Your Honor. That's why,

10:27AM 14   actually, in the indictment in this case, the Government

10:27AM 15   alleged discharge of the pollutant ammonia nitrogen in

10:27AM 16   Paragraph 17 of the indictment.

10:27AM 17       MR. HARRELL: Your Honor, I'll just point out that that's

10:27AM 18   the statutory element that has to be proven, and so the

10:27AM 19   indictment tracked the language of the indictment.

10:27AM 20       THE COURT: I would understand that. Is there anything else

10:27AM 21   on this issue?

10:28AM 22       MR. SHEPPARD: No, I don't believe so, Your Honor, other

10:28AM 23   than I would just point out that, again, it's the Government's

10:28AM 24   burden, with regard to showing the application of a particular

10:28AM 25   guideline and the relevant conduct here. I don't believe they

10:28AM 1   met that burden, again, because we don't believe there's any

10:28AM 2   evidence, Your Honor, of any discharge here that arises from

10:28AM 3   the count of conviction, which is the cornerstone and the

10:28AM 4   touchstone for the determination of proper guidelines.

10:28AM 5        THE COURT: Is there anything else that we want to cover

10:28AM 6   this morning on the issue of objections? The calculation will

10:28AM 7   turn on whatever I determine applies, in terms of (q)1.2 or

10:29AM 8   (q)1.3, I take it?

10:29AM 9        MR. HARRELL: Well, partly, Your Honor. And I guess this

10:29AM 10  really depends on how far the Court wants to go this morning. I

10:29AM 11  think the parties agree -- I'm almost afraid to say that -- but

10:29AM 12  I think the parties agree, Your Honor, that these two

10:29AM 13  guidelines run parallel to each other, and that the big

10:29AM 14  difference -- the substantive difference between the two is the

10:29AM 15  8 versus the 6 starting point.

10:29AM 16       The other issues, Your Honor, in terms of the objections we

10:29AM 17  have interposed, particularly, whether any of the substantive 1

10:29AM 18  through 4 enhancements, two of which the Probation Officer and

10:29AM 19  Government have sought to apply, which we have objected to,

10:29AM 20  they run parallel in both guideline sections, so the arguments

10:29AM 21  are essentially the same.

10:29AM 22       So our argument, Your Honor, succinctly stated, at least,

10:30AM 23  I'll try to be succinct, is that the record-keeping offense to

10:30AM 24  which Mr. Klepadlo has pled guilty to, there is no substantive

10:30AM 25  enhancement that should apply. If you look at both guidelines,

10:30AM 1   Your Honor, it says that if the record-keeping offense, which

10:30AM 2   is very broadly defined in both guidelines as including the

10:30AM 3   submission of false reports, which is what our client has

10:30AM 4   admitted to, if it's a record-keeping offense that was intended

10:30AM 5   to conceal a substantive violation of the permit.

10:30AM 6       For example, if there was a change in the form, a false

10:30AM 7   number written down to hide an exceedance, then, Your Honor,

10:30AM 8   the guideline properly says you should apply the substantive

10:30AM 9   enhancements.

10:30AM 10       In this case, Your Honor, there is no evidence of any

10:31AM 11   intention by my client to conceal any violation here. In fact,

10:31AM 12   as I noted earlier, Mr. Klepadlo admitted to the DEP

10:31AM 13   investigators, who are here and who will testify, and there's a

10:31AM 14   report, Your Honor, that is attached to somebody's memo, either

10:31AM 15   theirs or ours, that says my client, as early as 2013, admitted

10:31AM 16   to the DEP investigators that they did not go to the plant

10:31AM 17   every day, that they went, in his view and his understanding

10:31AM 18   was that they were going, at least, a couple times a week,

10:31AM 19   which meant that they were taking samples a couple times a

10:31AM 20   week, including the weekly composite samples, which we all

10:31AM 21   agree are the most important.

10:31AM 22       That's what my client believed in 2013, it's what he

10:31AM 23   believed in 2015 when he was interviewed by the FBI and the EPA

10:31AM 24   agents that are assigned to this case. It's the reason why he's

10:31AM 25   pled guilty. He has admitted that. He said to them, at the

10:32AM 1   time, that, in his view, daily testing of the pH and the DO

10:32AM 2   were not necessary for the safe treatment of the plant, and

10:32AM 3   that the pH levels would never vary between the ranges that

10:32AM 4   were set in the permit, and, Your Honor, that is, in fact, the

10:32AM 5   case. He also said, Your Honor, that he didn't feel it was

10:32AM 6   necessary to take all the other daily samples at both plants.

10:32AM 7   He admitted to that.

10:32AM 8       What he didn't admit to, Your Honor, and what they are

10:32AM 9   trying to now bring back into the case is that he didn't know

10:32AM 10  that the sewage treatment plant operator, who they will admit

10:32AM 11  was primarily assigned to these two plants, was not going with

10:32AM 12  the frequency that he believed he was.

10:32AM 13      So, in fact, we have this surveillance that shows that Mr.

10:32AM 14  Sheposh, who was the operator, the certified operator for these

10:32AM 15  two plants, was not, in fact, going. But, Your Honor, on the

10:33AM 16  issue of concealment and on the issue of my client's intent,

10:33AM 17  which is what's important here, there was no effort to conceal

10:33AM 18  the fact that they were not going to the plant every day. In

10:33AM 19  fact, the evidence is directly to the opposite.

10:33AM 20      So, Your Honor, in our view, and our argument is that, as a

10:33AM 21  matter of fact and as a matter of law, the substantive

10:33AM 22  enhancements of 1 through 4 of each of those guidelines,

10:33AM 23  whether it's 2(q)1.2 or 2(q)1.3 do not apply, and this is, in

10:33AM 24  fact, a record-keeping offense, and, therefore, the guideline

10:33AM 25  range should not be enhanced by either sub 1 or sub 4, which

10:33AM 1    are the continuous discharge in violation of a permit, and No.

10:33AM 2    4, which is -- I can't remember -- but they both relate to

10:33AM 3    substantive offenses, again, Your Honor, which are not --

10:33AM 4         THE COURT: So you're talking about Paragraphs 25 and 26?

10:34AM 5         MR. SHEPPARD: Yes.

10:34AM 6         THE COURT: Is that right?

10:34AM 7         MR. SHEPPARD: Yes, Your Honor.

10:34AM 8         THE COURT: Got it.

10:34AM 9         MR. SHEPPARD: I'm sorry, Your Honor. Again, the key is,

10:34AM 10   under the guidelines, where it's a record-keeping offense,

10:34AM 11   which is defined in the guidelines, very broadly, clearly

10:34AM 12   captures the offense conduct here, unless there is evidence of

10:34AM 13   an intention to conceal, the substantive enhancements that are

10:34AM 14   sought to be applied by the Government do not apply.

10:34AM 15        THE COURT: All right. Anything you want to say about that?

10:34AM 16        MR. HARRELL: Yes, Your Honor. Whether they sampled two days

10:34AM 17   a week for daily samples or they sampled two days a month, they

10:34AM 18   weren't testing every day, as Mr. Sheppard just acknowledged.

10:34AM 19   Yes, it's true his client admitted to various regulators over a

10:34AM 20   period of years that he didn't think it was necessary to take

10:34AM 21   samples every day, that he knew better than what was in the

10:34AM 22   permit, that he admitted he wasn't taking samples every day,

10:34AM 23   but he continued to lie on the DMR's he sent to the DEP.

10:35AM 24        They put in sample numbers for every day, he admitted, in

10:35AM 25   person, that he had failed to comply with the permits

10:35AM 1 requirement for daily testing --

10:35AM 2    THE COURT: Let me get that straight. So you suggest that he

10:35AM 3 did try to conceal by submitting false samples every day?

10:35AM 4    MR. HARRELL: False results for every month, for days. If

10:35AM 5 you're not concealing, why make up bogus numbers?

10:35AM 6    THE COURT: Well, that's how you encounter the concealment

10:35AM 7 argument?

10:35AM 8    MR. HARRELL: Absolutely.

10:35AM 9    THE COURT: Understood.

10:35AM 10    MR. SHEPPARD: Your Honor, may I just briefly respond? Very

10:35AM 11 briefly. Your Honor, if that's what he did, he didn't do a very

10:35AM 12 good job of concealing, number one.

10:35AM 13    Number two, Your Honor, the evidence in this case, Mr.

10:35AM 14 Sheposh wore a wire, he recorded over 50 conversations. The

10:35AM 15 best evidence of the lack of my client's knowledge is in those

10:36AM 16 intercepts. When he says to Joe Sheposh, I told them we were

10:36AM 17 not there every day, and Joe says, Well, I told them we were.

10:36AM 18 His response is, You did? That's what's on the tape. Your

10:36AM 19 Honor, there was no he effort to conceal what he has admitted

10:36AM 20 to.

10:36AM 21    Your Honor, with regard to the DMR's, again, it's Mr.

10:36AM 22 Klepadlo's name on the door, we get that, he clearly is a

10:36AM 23 responsible officer, and we understand that, too. But with

10:36AM 24 regard to his intent to conceal, Your Honor, Joe Sheposh was

10:36AM 25 the certified operator, he was the one who signed the forms.

10:36AM 1  They were submitted by Mr. Klepadlo as the responsible officer.

10:36AM 2  That's why we're pleading guilty here. But there was no effort

10:36AM 3  by my client to conceal anything. That's our argument.

10:36AM 4      MR. HARRELL: Your Honor, if I understand the chronology,

10:37AM 5  Mr. Sheposh would prepare the DMR, would show a daily sample

10:37AM 6  for every day of the month. Mr. Klepadlo has admitted that he

10:37AM 7  knew Mr. Sheposh was not taking daily samples. He wasn't taking

10:37AM 8  daily samples, but he's still signing a report that has numbers

10:37AM 9  for daily samples. That's concealment.

10:37AM 10      As for the number of recorded conversations, I think that's

10:37AM 11  just a difference in somehow counting, because we have a much

10:37AM 12  lower number, but that's not really relevant to the discussion

10:37AM 13  on this particular issue.

10:37AM 14      MR. BERGERE: Your Honor, if I might rise on that issue.

10:37AM 15  The sequence of events is important to understand. Joe Sheposh

10:37AM 16  was the operator. Joe Sheposh would collect samples, and he

10:37AM 17  would take them, physically, to the laboratory. The laboratory

10:37AM 18  would analyze them and put the results on the DMR form at the

10:37AM 19  laboratory, based on the samples that they received.

10:37AM 20      The Government has the sheets from Microbac Lab, where Joe

10:38AM 21  Sheposh dropped them off, he relinquished control of them

10:38AM 22  there. Mr. Klepadlo is sitting in his kitchen and on his

10:38AM 23  computer, the DMR forms show up completed, except for pH. Joe

10:38AM 24  Sheposh would come to his house, would sit down at his table,

10:38AM 25  would sign the certification saying, I swear that everything in

10:38AM 1   there is true.

10:38AM 2       As to the Greenfield treatment plant, there was no

10:38AM 3   requirement to record in the DMR the daily pH's, the only thing

10:38AM 4   they recorded was a range. On the Benton-Nicholson forms, there

10:38AM 5   was a daily, because they changed the form, the daily form,

10:38AM 6   when the permit was renewed.

10:38AM 7       The Greenfield Township permits of 2009 hasn't been renewed

10:38AM 8   in a decade, but Mr. Sheposh filled those things in. And as he

10:38AM 9   told the officer, Mr. Sheposh said he recorded those numbers in

10:38AM 10  his iPad or Notepad, that he filled them out. My client didn't

10:38AM 11  know that he was filling out all of those numbers, except as to

10:38AM 12  Benton-Nicholson as to the pH. Those are the days he knew he

10:38AM 13  wasn't showing up, and he recorded it in a range.

10:39AM 14      In his own mind, the pH didn't vary, because it's ground

10:39AM 15  water, it's not going to vary anywhere near the permit limits.

10:39AM 16  In his own mind, that was the risk that he accepted, but all

10:39AM 17  the other falsifications, Mr. Sheposh was showing up with

10:39AM 18  samples, the issues we all have is where he was getting them

10:39AM 19  from, we don't know, but he is responsible for that conduct,

10:39AM 20  and that's not what we're pleading to.

10:39AM 21      THE COURT: All right.

10:39AM 22      MR. HARRELL: Your Honor, I don't have anything to add.

10:39AM 23      THE COURT: Okay. Anybody want to say anything else? I'll

10:39AM 24  give you the last word.

10:39AM 25      MR. SHEPPARD: He rises with some trepidation. Your Honor, I

10:39AM 1    know the Court has other things on the schedule here, but there

10:39AM 2    are, as Mr. Harrell pointed out, two guided departures, that if

10:39AM 3    the Court were to apply these substantive enhancements under 1

10:39AM 4    and 4 of the guideline range, it's our argument, in the

10:40AM 5    alternative, that there should be a two-level decrease, as set

10:40AM 6    forth in those guidelines, themselves, because of a lack of

10:40AM 7    environmental harm here and the seriousness or the lack of

10:40AM 8    seriousness of our client's conduct or, at least, his

10:40AM 9    intentions.

10:40AM 10        THE COURT: Well, I understand that. I'm not going to

10:40AM 11   determine that. I'll give you an opportunity to argue that when

10:40AM 12   we have sentencing.

10:40AM 13        MR. SHEPPARD: And in terms of the guidelines, Your Honor,

10:40AM 14   those were the objections --

10:40AM 15        THE COURT: All right.

10:40AM 16        MR. SHEPPARD: -- that we had interposed. So those were the

10:40AM 17   guideline objections.

10:40AM 18        THE COURT: All right. I will take this under advisement,

10:40AM 19   and we will reschedule -- we will schedule another date for

10:40AM 20   sentencing. In the meanwhile, I'll determine the issues here

10:40AM 21   and issue an opinion in short order.

10:41AM 22        MR. SHEPPARD: Thank you, Your Honor.

10:41AM 23        MR. HARRELL: Thank you.

10:41AM 24        THE COURT: Sorry for the inconvenience, but there were so

10:41AM 25   many documents filed here that I thought this was the best way

10:41AM 1  to handle this. I know everybody has traveled here, and I know

10:41AM 2  it's expensive, and I apologize for that, but I think, in order

10:41AM 3  to give it the proper care and treatment that it deserves, this

10:41AM 4  is the best way to proceed.

10:41AM 5      MR. SHEPPARD: We understand that, Your Honor. And if I may,

10:41AM 6  sir, just one other point. With regard to the Board resolution

10:41AM 7  that was received this morning, Your Honor, this is the first

10:41AM 8  that we have heard there an issue of restitution here,

10:41AM 9  though, we have been told that one may be coming.

10:41AM 10      Your Honor, we would like the opportunity to try to address

10:41AM 11  in the interim, if we may. I think our argument is going to be

10:41AM 12  very similar, in that, there is no restitution that should flow

10:41AM 13  from the count of conviction, which, again, under the mandatory

10:41AM 14  witnesses act --

10:42AM 15      THE COURT: I looked at this this morning. I don't see

10:42AM 16  any -- I see a lot of whereas clauses, I see no, be it

10:42AM 17  resolved. So I don't know what this means, so I'll give you an

10:42AM 18  opportunity to -- I'll give both sides an opportunity to

10:42AM 19  determine what to do with it. I don't know what to do with it

10:42AM 20  at the moment.

10:42AM 21      MR. SHEPPARD: Thank you, Your Honor.

10:42AM 22      THE COURT: All right, thank you. Thank you all.

23      (At this time the proceedings were adjourned.)

24

25

26

C E R T I F I C A T E

1

2

3       I, KRISTIN L. YEAGER, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of

6  Title 28, United States Code, Section 753, do hereby certify

7  that the foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has

11  been prepared by me or under my supervision.

12

13                          S/Kristin L. Yeager
                            KRISTIN L. YEAGER, RMR,CRR
14                          Official Court Reporter

15

REPORTED BY:
16
        KRISTIN L. YEAGER, RMR,CRR
17      Official Court Reporter
        United States District Court
18      Middle District of Pennsylvania
        P.O. Box 5
19      Scranton, Pennsylvania  18501

20

21

22          (The foregoing certificate of this transcript
    does not apply to any reproduction of the same by any means
23  unless under the direct control and/or supervision of the
    certifying reporter.)

24

25