UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-254 |
| | : | |
| v. | : | (JUDGE MANNION) |
| | : | |
| DAVID D. KLEPADLO, and | : | |
| DAVID D. KLEPADLO & | : | FILED ELECTRONICALLY |
| ASSOCIATES, INC. | : | |
| Defendants | : | |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

This sentencing memorandum is intended to supplement the Government's initial Sentencing Memorandum filed on September 24, 2019 (Doc. 40).  Herein, the Government will address the outstanding sentencing guideline issues; Klepadlo's stated health concerns in support of a variance (Doc. 70); and then set forth its reasons why the 37-month prison sentence sought a year ago by the Government remains its position.  However, as explained below, the Government recognizes that Klepadlo has health issues, and will not oppose a delayed reporting date in the discretion of the court.

## I.  Introduction

The Government believes it is appropriate to set forth who the defendants are and describe their business activities given the passage

1

of time and the Court's recent assignment to this case.  Klepadlo is a well-known licensed professional engineer and licensed wastewater treatment plant operator in northeast Pennsylvania.  His firm, David D. Klepadlo and Associates, Inc., (DKA) was a multi-discipline engineering firm in which he was the principal and the decision-maker. As part of its business, Klepadlo and his firm designed and operated wastewater treatment plants for rural municipal agencies as one part of his business operations.  Operating such plants was one facet of Klepadlo's business operations.  These facts are uncontested.

Klepadlo operated publicly owned treatment plants (POTWs), commonly known as sewage treatment plants, under contract to various municipalities, including the Greenfield Township Sewer Authority (GTSA) and the Benton-Nicholson Sewer Authority (BNSA).[1]  Klepadlo designed and operated such plants for decades.  He operated GTSA from 1991 or earlier until January, 2018, after designing it, and was the contract operator at BNSA from 2007 until his indictment in 2016. These plants treated sewage – human waste - generated by residential

---

[1] When the investigation began, Klepadlo operated four such plants.

and commercial customers.  The plants were supposed to treat human waste to make it safe to discharge into small receiving streams which flowed into larger water bodies making up larger watersheds that are part of the Susquehanna River drainage area.  The Susquehanna River is the lifeblood of the Chesapeake Bay.  The Pennsylvania Department of Environmental Protection (PADEP), acting pursuant to a delegation of authority from the U.S. Environmental Protection Agency (EPA), had issued Clean Water Act permits to GTSA and BNSA authorizing them to discharge treated and monitored sewage to small streams.

The potential harms from untreated or partially treated sewage are well known, especially to someone with Klepadlo's education, training and work experience.  The GTSA and BNSA relied on Klepadlo's expertise to operate their plants, comply with the law and protect the environment and public health.  It was his job – and his job alone - to ensure that his firm performed all the duties required by its contacts with the GTSA and BNSA, including abiding by all Clean Water Act permit requirements.  He knew that GTSA and BNSA would be legally liable for any permit violations since the permits were issued to the Authorities.  *See* 33 U.S.C. § 1319(d), (g).

3

It was Klepadlo's responsibility to ensure that he had sufficient staff to perform the duties required by his clients and their CWA permits, and to ensure that staff performed duties assigned by him. He knowingly failed to do so for years, both by his own admission and in documented PADEP inspections.  The faith that clients placed in him is evidenced by the fact that the GTSA continued to employ him for 15 months even after he was indicted in September, 2016, and twice arrested.  However, despite this faith, he continued to let the GTSA down.  The GTSA ultimately fired him after federal agents executed a post-indictment search warrant at the GTSA on December 12, 2017, and PADEP issued a field order the same day to GTSA requiring it to take corrective action.

Klepadlo continues to insist that his guilt on Count 4 is based on a failure to supervise his employee.  (Defendants' Sentencing Memorandum (DSM), Sealed, 9/27/19); Exhibit A (letter of David D. Klepadlo).  However, the facts show that Klepadlo knowingly failed to perform daily and weekly sampling required by the CWA permits because he did not think it was necessary, and that it was a "waste of time" and "resources."  In other words, he substituted his judgment for

that of the PADEP and the law, and cheated his clients who paid him to perform all the tasks required by the CWA permits.

The Government provides the following basic outline of the technology used at both the GTSA and BNSA sewage treatment plant to inform the Court's understanding of the guideline issues discussed below. These plants exist to treat domestic sewage, generated by residential and commercial customers. Sewage flows via pipes and pump stations to the plants. Each plant uses a Sequenced Batch Reactor (SBR) unit to process and treat the wastewater. Disinfection using an Ultraviolet (UV) light at GTSA and at BNSA occurred near the end of the treatment process. These systems operate on an approximately four-hour cycle, with wastewater being discharged from a reactor for approximately 20 minutes at the end of each cycle. The reactors operated in sequence at GTSA and at BNSA so that one or the other of the two SBRs would discharge every two hours. Thus, the two plants did not discharge continuously into receiving streams but instead discharged their contents on the predetermined schedule. Compliance sampling had to occur during the time when discharges were occurring to be meaningful.

A preliminary issue that seems to underlie much of the parties' sentencing guideline disputes involves the scope of conduct the Court is to consider in sentencing the defendants. As evidenced by the sentencing memoranda previously filed, the parties take very differing views of the scope of the conduct which the Court should consider. As the Court is well aware, the Supreme Court has ruled that uncharged, charged but not convicted, and even acquitted conduct may be used at sentencing as relevant conduct. *United States v. Watts*, 519 U.S. 148 (1997). In this case, Klepadlo's operation of the sewage plants and the permit violations he committed are relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(B). *See* PSR ¶ 21. This includes the charged counts to which Klepadlo did not plead guilty. Thus, as much as Klepadlo suggests otherwise, the Court is not limited to considering the offense conduct in Count 4 in determining the applicability of enhancements under Chapter 2Q1.2 and 3. The Government made it clear in its initial Sentencing Memorandum that it was using relevant conduct, and Klepadlo has not contested its applicability in this case. (Doc. 40, p. 24).

II.  <u>Whether Section 2Q1.2(b)(1) Applies</u>

The defense, in its recent Supplemental Sentencing Memorandum (Doc. 70) agreed that Section 2Q1.2(b)(4) applies based on Judge Caputo's October 9, 2019, Memorandum Opinion.  (Doc. 54, p. 5).  However, Klepadlo still argues that Section 2Q1.2(b)(1) does not apply.  The Government disagrees.

First, Klepadlo agrees that Judge Caputo's ruling is the law of the case.  (Doc. 70, p. 4).  The Government believes that the Court decided the Section 2Q1.2(b)(1) issue in that ruling.  To recap, Judge Caputo first ruled that Section 2Q1.2 applied in this case rather than Section 2Q1.3.  The Court then rejected Klepadlo's claim that this was a "simple recordkeeping offense" pursuant to Application Note 6, which did not involve any offense characteristics under Section 2Q1.2.  Rather, the Court found that "his actions reflect a conscious effort to conceal his neglect for the dictates of the NPDES permits. For over a year he failed to operate and manage GTSA and BNSA [citations omitted].... Klepadlo only visited each facility a few times per week, even though the NPDES permit for each facility required daily testing of various pollutants. (citation omitted).  To hide his mismanagement and infrequent visits,

Klepadlo estimated results on DMRs, while simultaneously certifying that all pollutant samples were accurately tested and reported in compliance with the NPDES permits (citation omitted)." (Doc. 54, p. 8). Judge Caputo further cited evidence that PADEP inspectors saw growths around discharge pipes that caused them concern. *Id.* Thus, it is not accurate to claim, as Klepadlo does on page 4 of his Supplemental Sentencing Memorandum, that the only aspect of the case that Judge Caputo considered was failure to do sampling. It is clear Judge Caputo's references to failure to operate and maintain the plant and the PADEP's observations of disturbing conditions at the GTSA plant show that he took a broad view of the relevant conduct in this case. The Government asks this Court to follow that same path.

Second, the discharge of wastewater without compliance monitoring required by the permit is illegal on its face. (GTSA NPDES Permit No. PA 0061671, p. 1 – "GTSA authorized to discharge in accordance with effluent limitations and monitoring requirements of permit."). Thus, it is wrong to claim that the Government has failed to establish that illegal discharges of wastewater occurred. As Judge Caputo found, the very nature of Count 4 established that Klepadlo

8

falsified DMRs to cover up his unmonitored – and thus illegal -

discharges.

Moreover, the broader relevant conduct in this case provides

additional proof of such illegal discharges.  Judge Caputo clearly took

relevant conduct into account, including the illegal discharges set forth

in Counts 2 and 3 of the Indictment, including inspectors' observations

of various fungal growth and bloodworms in the channel taking the

GTSA discharge to the stream.  The Government cited this conduct as

relevant conduct in its initial Sentencing Memorandum, and provided

photographs and other evidence to support its position.  Klepadlo has

not disputed that such events occurred and were observed by PADEP.

The Government summarizes its prior relevant conduct here.  The

charged conduct to which Klepadlo did not plead guilty involved various

aspects of Klepadlo's performance of his contracts to operate and

maintain the plants in addition to performing compliance monitoring

and reporting, including a two-year Clean Water Act conspiracy charge

in Count 1.   Counts 2 and 3 specifically involved failure to operate the

plants, and the evidence clearly shows that Klepadlo violated various

terms of the GTSA and BNSA Clean Water Act permits.  His conduct

involved discharges into the environment on multiple occasions, and that is sufficient to trigger application of Section 2Q1.2(b)(1)(A). *United States v. Smith*, 629 Fed. Appx 292, 297 (3d Cir. 2015) (6-level enhancement "easily met" in Clean Air Act asbestos prosecution where "months of substandard asbestos removal" resulted in friable asbestos in air, bags of asbestos littered about the property, and a dumpster full of asbestos exposed to the elements). *United States v. Chau*, 293 F.3d 96, 100 (3d Cir. 2002) (asbestos); *United States v. West Indies Transport, Inc.*, 127 F.3d 299 (3d Cir. 1997) (Clean Water Act). Thus, the Court should find, if it concludes Judge Caputo did not already decide this issue, that Section 2Q1.2(b)(1)(A) applies in this case, and that Klepadlo is subject to a six-level enhancement for repetitive, continuous or ongoing discharges into the environment.

III.   **Guided Departures Pursuant to Sections 2Q1.2(b)(1) and (b)(4)**

In his initial Sentencing Memorandum, Klepadlo devoted less than two pages in arguing why Klepadlo should receive separate two-level reductions in the Section 2Q1.2(b)(1)(A) and (b)(4) specific offense enhancements based on Application Notes 5 and 8.  However, he failed to set forth that he bears the burden of proof and did not provide a

detailed examination of the factors set forth in the two Application Notes. (DSM, p. 14-15). Having had almost a year to consider the Government's arguments on this point, Klepadlo expanded his discussion to three pages in his Supplemental Sentencing Memorandum, pages 7-10. Both memoranda rely heavily on a report prepared by Kevin Long, an environmental consultant hired by Klepadlo. As the Government points out below, Mr. Long's report is focused narrowly on one aspect of the case, does not address the long-standing volume of pollution discharges on unmonitored days, and pollution resulting from Klepadlo's relevant conduct.

The Government agrees that the Court may consider these departures, which are referred to as "guided' departures because the Application Notes specify the factors to be considered by the Court and the amount of upward or downward departure which a Court may grant. It is important to note that any departure may be one or two levels; it is not a question of automatically applying a two-level reduction if the Court finds that either guided departure applies.

In his Supplemental Memorandum, Klepadlo writes as if the Government has the burden of proof to establish any of the factors set

forth in the two Application Notes, especially environmental harm. However, the opposite is true. Klepadlo must prove by a preponderance of evidence that he is entitled to either of the guided departures. The Court should deny both requests since Klepadlo has not met his burden of proof, even if the Court limits its consideration to the conduct underlying Count 4. *West Indies Transport*, 127 F.3d at 605-06 (district court's refusal to depart not erroneous even if pollutants were fully biodegradable).[2]

Application Notes 5 and 8 set forth the factors that a Court should consider in deciding whether to apply a one- or two-level reduction. The factors are similar, but Klepadlo correctly points out each guided departure must be analyzed separately. The Section 2Q1.2(b)(1), Note 5 factors include harm resulting from the discharge, quantity and nature of the substance or pollutant, duration of the offense and the risk associated with the offense. The Section 2Q1.2(b)(4), Note 8 factors are

---

[2] The Government notes that Klepadlo has not challenged many of the facts outlined in the PSR, including the time period of the Government's 2013-2014 video surveillance at both plants and the determinations of how infrequently Klepadlo or his employee came to either plant to perform Klepadlo's contractually and legally required tasks.

more limited and focus on nature and quantity of the substance or pollutant involved and the risk associated with the offense. The Government considered these factors, and some of the points Klepadlo raises, in deciding not to seek upward guided departures for either Application Note.

In his sentencing memoranda, Klepadlo made broad claims about lack of environmental harm while failing to consider his broad and lengthy pattern of illegal conduct. Klepadlo failed to examine in detail each of the factors set forth in the Application Notes. In doing so, he ignored the relevant facts the Court must consider, both with regard to Count 4 and the broader relevant conduct in this case. These factors overlap; however, the Government will discuss each factor in detail rather than engaging in a generalized discussion about environmental harm.

IV.   <u>Section 2Q1.2(b)(1)(A), Application Note 5</u>

The goal of the Clean Water Act is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). With that goal in mind, the analytical starting point is the Sentencing Commission's determination that 2Q1.2(b)(1)

"assumes a discharge. . .into the environment resulting in actual environmental contamination." Application Note 5. With contamination established, the Court must determine whether the factors in Application Note 5 justify a reduction of any kind.

## Harm

It is not the Government's burden to prove that environmental harm existed or to what degree as a result of Klepadlo's conduct. Klepadlo's bears the burden of proof, and he principally relies on the expert report of Kevin Long, whom the Government understands will not testify at sentencing. For the reasons set forth below, Mr. Long's limited conclusions, based on very limited sampling data, are insufficient to meet Klepadlo's burden of proof.

Mr. Long's report focuses on one very limited aspect of this case – Klepadlo's failure to perform required daily and weekly sampling at the two plants – and ignores the relevant conduct in this case. The Government makes the following observations about Mr. Long's qualifications, his methodology and his conclusions based on the information contained in his report.

- The Government agrees that Mr. Long is an expert in the fate and transport of pollutants and doing various kinds of risk analyses.

- Mr. Long is not a licensed wastewater treatment plant operator, and his specific qualifications discussed in his report do not mention wastewater treatment plant expertise.

- Mr. Long did not visit either of the sewage treatment plants involved in this case.

- He did not speak with Klepadlo or any person at GTSA or BNSA involved in overseeing Klepadlo's work.

- Mr. Long did not speak with any employee of Klepadlo.

- Other than a GTSA DMR for November, 2017, the month before federal agents executed a search warrant at the plant, he did not use any sampling data EVER reported by Klepadlo for either plant.  Why Mr. Long chose to use data submitted on the November, 2017, DMR remains a mystery since Klepadlo was fired by GTSA after the December 12, 2017, search.  In fact, the GTSA brought in a new, very experienced engineer to evaluate the plant the day after the search.  Mr. Long does not

discuss his findings or any corrective action the GTSA had to
take.

- To make up for his lack of use of sampling data reported by
Klepadlo, Mr. Long used nine grab samples taken by PADEP
over almost four years in forming his conclusions.  Seven were
taken from the GTSA discharge between 2012 and 2016 and
two were taken from BNSA's discharge a few months apart in
2014.  Thus, at best, Mr. Long used grab samples taken on nine
days out of almost 1800 days to extrapolate from in forming his
conclusions.

- Mr. Long used seven GTSA grab sample results obtained by
PADEP as part of his analysis for ammonia-nitrogen while
saying at the same time that composite samples would have
been better to measure ammonia and compliance with NPDES
permits at both plants.[3]

- Mr. Long failed to discuss the improper operation and
maintenance aspects of the case at all, including the site

---

[3] Three of the seven samples reflected exceedances of the
instantaneous maximum permit limit for ammonia-nitrogen.

conditions observed by PADEP between 2013 and 2017. This
included his failure to discuss the relevant conduct in this case,
including the two-year conspiracy charge and the permit
violations contained in other counts. He does not address the
points about harm and risk detailed in the Government's initial
Sentencing Memorandum.

The bottom line is that Mr. Long's conclusions about lack of
environmental harm from Klepadlo's conduct are based on the
assumption that the plants discharged wastes with the same
characteristics on the very limited days in which someone actually
sampled and the many, many days in which sampling did not occur.
Mr. Long focused his entire report on Klepadlo's failure to take daily or
weekly sampling for almost six months for pH and ammonia, totally
disregarding the fact that Klepadlo admitted in 2017 to not performing
daily sampling for 20 years. He may not have been made aware of that
admission. Mr. Long also decided to throw out any sampling data
reported by Klepadlo for five years at the GTSA and BNSA plants,
presumably because of the questions about Klepadlo's sampling
practices. He ignored the fact that, with no one coming to the plants for

17

long periods of time, Klepadlo effectively rendered it impossible to determine the quality of the sewage coming from the plants for months and years.

In essence, Mr. Long and Klepadlo seek to have the Court give him the benefit of having very limited sampling data when Klepadlo is responsible for the lack of reliable data. This would only serve to reward criminal conduct. Further, Mr. Long ignored the fact that, at GTSA, six weeks or more sometimes passed before an operator showed up and took an actual sample, whether that was a grab or composite sample.

Mr. Long additionally failed to discuss the PADEP's observations about the presence of condoms and tampon applicators along the GTSA discharge channel and the presence of bacterial growth and bloodworms indicative of poorly treated sewage. It is almost as if he was not provided with the PADEP inspection reports that covered almost five years or any Notices of Violation issued to the permittees, or even the conduct described in the two-year conspiracy charged in Count 1. Further, the various photos taken between 2013 and 2017 during PADEP inspections at GTSA, attached to the Government's initial

Sentencing Memorandum, demonstrate that the plant had operational issues even when operators came daily or at least more regularly than a day or two a week.   (Doc. 40, Exhibits 1.1 through 8.4).

Given Klepadlo's continued insistence that his conduct had no or little effect on the environment or created a risk of harm, the Government has attached two reports submitted by the professional engineer hired by the GTSA after it fired Klepadlo shortly after execution of a federal search warrant on December 12, 2017.  On January 10, 2018, the engineer reported that he had been to the plant four times since December, 13, 2017, the day after the search warrant. (*See* Exhibit A).  He reported that "[t]he plant is reporting an effluent quality to PADEP which is not possible with the current installed equipment."[4]  *Id.* p. 1.  He further noted that the composite sampler used to take samples of the discharge was taking samples while the plant was not discharging.  His succinct conclusion: "Effectively, the plant has no good sampling data."  *Id.*  On February 22, 2018, the engineer reported that he had discovered that the GTSA plant's system

---

[4]  The new engineer also reported that the plant was set to take samples at times when wastewater was not being discharged.  (Exhibit A, p. 1).

used to measure flow was undercounting flow volume.  (*See* Exhibit B, p. 1).  Correct flows were in the neighborhood of 60,000 gallons per day rather than reported 20,000-40,000 gallons per day.  Mr. Long used the flow reported by Klepadlo on the DMRs for years but not any sample results reported by Klepadlo.  The engineer also reported that some of the sewage was bypassing the UV disinfection process.  *Id.*

In addition, the GTSA has filed a victim impact statement with the Court.  That statement, dated September 26, 2019, is attached as Exhibit C.  The GTSA detailed its history of employing Klepadlo and his firm to design and construct the plant and serve as the GTSA Engineer.  The GTSA further noted that, following its firing of Klepadlo in January, 2018, it slowly learned from professional engineers the horrible operational condition of the plant and that Klepadlo had misrepresented the condition of the plant repeatedly to the Board of the GTSA.  *Id.*  At the time of submission, the GTSA estimated it would have to spend $600,000 or more to fix the problems.  Since then, the GTSA has sued Klepadlo for more than two million dollars in Lackawanna County Court of Common Pleas.  (*Greenfield Township Sewer Authority v. David D. Klepadlo*, Lack. Co. 19-CV-7106) (Klepadlo

has filed a counterclaim and added the defendants in the related federal criminal case as civil defendants.)[5]

Even as late as December, 2017, Klepadlo had trouble operating the GTSA plant.  On December 12, 2017, PADEP inspector Jeremy Miller took a grab sample of wastewater at the facility's compliance monitoring location (where the wastewater left the UV disinfection point).  Sewage solids covered part of the UV device itself, preventing it from being able to fully disinfect wastewater which contained fecal coliforms.  (Doc. 40, Exhibit 8.1).  As it turned out, Klepadlo had taken a grab sample allegedly at the same location only a few hours prior to Miller's sample, based on a chain of custody form signed by Klepadlo. The fecal coliform readings for the two samples are dramatically different.  The fecal coliform limit at GTSA in December, 2017, was 2,000 fecal colonies per 100 milliliters.  As attached Exhibit D shows, the grab sample taken by Klepadlo was analyzed by a third-party lab hired by GTSA and found to contain 98.5 fecal colonies per 100 milliliters.  In contrast, a PADEP laboratory analyzed Miller's sample

---

[5] The related case is *United States v. Bruce Evans, et al*, No. 3:CR-19-009.  A superseding indictment was obtained on May 28, 2020.  (Doc. 62).

taken a few hours after Klepadlo's and found that it contained 161,000 fecal colonies per 100 milliliters – 80 times the permit limit and 1,724 times the level in Klepadlo's sample.  The inspector also observed unacceptable conditions in the stream channel that day.  As a result, the PADEP issued a field order to the GTSA – the permittee – requiring it to take corrective action at the plant.  The GTSA brought in another wastewater engineer the next day, and fired Klepadlo in early January 2018.

### Quantity and Nature of the Pollutant

Klepadlo claims that the "quantity" of pollutants discharged illegal was "small".  (Doc. 70, p. 10).  This is simply not true based on simple math.

Even if the Court just focuses on the six-month time period between December, 2013, and June, 2014, during which Klepadlo and his employee routinely failed to show up at the two plants and covered that up by falsifying DMRs, the amount of sewage discharged into these streams was substantial.  The Government calculates that the total amount of sewage discharged from the GTSA plant into the small tributary of Dundaff Creek on days when no one checked on the plant

during that surveillance period was almost six million gallons –

5,993,352. This is not a small amount of illegally discharged

wastewater. The Government conservatively calculated this number by

taking the average daily flow reported by Klepadlo to the PADEP

(giving him the benefit of the doubt about the accuracy of his flow

measurements), and removing the flow on all the days someone came to

the plant even if no sampling was performed on those limited days. No

one came on 116 days. PSR ¶ 12.

The unnamed tributary's flow downstream from the GTSA plant

consists in large part of the GTSA effluent until it flows into Dundaff

Creek. The tributary flows into Dundaff Creek, which has been

designated by PADEP as a habitat for Warm Water Fishes/Migratory

Fishes. 25 Pa. Code § 93.9i, Drainage List I. To say that regular

unmonitored discharge of this magnitude over a period of months from

a plant with no regular maintenance or operator checks, much less

sampling, is "small" defies belief. Similarly, the Government

conservatively calculates the amount of sewage discharged into the

environment from the BNSA plant at 2,064,742 gallons. This amount

reflected the 80 days neither Klepadlo nor his worker showed up at the

23

plant.  PSR ¶ 13.  Of course, the almost 8 MILLION gallons of
unmonitored sewage coming out of the two plants is just the flow
occurring during the six-month surveillance from December, 2013 to
June, 2014.  Klepadlo has admitted that he did not sample every day at
these and other sewage treatment plants for two decades or more, so
the total unmonitored discharge volume would be exponentially more
over time.

Klepadlo focuses his harm attack on the supposed minimal or no
impact flowing from his failure to sample and test for pH and ammonia.
As Klepadlo knows, given his professional credentials and lengthy
experience, there are indicator parameters that show how well a plant
is operating.  Controlling them are essential in reducing the impacts on
a receiving stream, especially at GTSA where the plant's discharge
dwarfs the stream flow prior to discharge, and providing accurate data
to PADEP is essential for it to monitor a facility's performance.
Submitting accurate, honest monitoring data required by NPDES
permits is at the heart of the CWA's self-monitoring program because it
enables PADEP to evaluate plant's performance and compliance.
Klepadlo's failure to provide accurate and timely data because he did

not think it was necessary, or did not want to do it himself or have

sufficient staff to do the required work, does not alter the fact that these

plants were discharging human waste, and that Klepadlo left the plants

to run on their own while he and his employee worked elsewhere on

DKA business.

It is important to keep in mind the nature of the pollutants being

discharged into the receiving streams, including an unnamed tributary

of the South Branch of Tunkhannock Creek which received the

discharge from the BNSA plant.  PADEP has designated that unnamed

tributary as habitat for Cold Water Fishes/Migratory Fishes.   25 Pa.

Code § 93.9i, Drainage List I.  The residential and commercial sewage

coming into both plants contained ammonia, a toxic water pollutant.  33

U.S.C. § 1321(b)(2).  The sewage also contained fecal coliforms, a

bacteria known to cause human illnesses.  Klepadlo was supposed to

operate the plants to remove these substances to acceptable levels as

determined by PADEP.  He cannot seriously claim he did so because

neither he nor his employee checked the plants regularly, must less

daily, and discharged at least 8 million gallons of unmonitored sewage.

The real number is much more: he admitted to federal agents in

August, 2015, that he continued his practice of not sampling daily

through August, 2015, more than a year after the video surveillance

ended in June of 2014, and more than two years after being told in April

of 2013 by PADEP to stop reporting fake numbers.

## Duration of the Offense

Klepadlo has admitted that he routinely failed to take daily

samples for 20 years or more, PSR ¶ 11, because he considered it

"unnecessary", "a waste of time" and "resources" (his own resources to

be clear since he paid an employee to do this work or did it himself

when it actually happened).  The surveillance at GTSA showed that he

or his employee came to the plant on only 17 days.  Many of these visits

were bunched together.  Moreover, sampling was visible at GTSA on

only eight of the 17 days where someone showed up.  With regard to

BNSA, the camera's position was less well suited to capture attendance

at the plant and could not see whether sampling occurred when people

did arrive because the sampling point was inside a building.  Still,

operators failed to appear on at least 80 days during the six-month

period.[6]  These failures and the creation of sampling data were not one-time events, but a recurring pattern of conduct done, by Klepadlo's own admission, to save time and money and because he thought they were unnecessary.  PSR ¶ 11.  Klepadlo admitted to federal agents that he still failed to sample daily as of August, 2015, and further admitted to performing this illegal conduct for more than 20 years.  This time period would cover much if not all of the time he operated the GTSA facility and the entire time he operated the BNSA plant.

As will be shown at the sentencing hearing, the failure to properly operate the plant continued over a period of years despite repeated inspections by PADEP.

### Risk Resulting From the Offense

Many of the points discussed above apply to this factor.  Even Klepadlo acknowledges that failing to come to the plants each day presented risk of harm, although he minimizes his role in that conduct by saying that his "inattentive oversight of the plant's operations *could have* resulted in harm." (Doc. 70, p. 9).  (Emphasis in original).  During

---

[6] In its Sentencing Memorandum, the Government erroneously referred to 34 days.  (Doc. 40, p. 13-14).  The 80 days is the uncontested number contained in paragraph 13 of the PSR.

the surveillance period, the lack of daily visits to the plants presented various risks: that the plants would not operate properly with no one attending to them, that they would discharge sewage which, at best, had only been partially treated, and that Klepadlo's continued lying on DMRs would mislead PADEP into thinking he had changed his ways, and that he was operating the plants well. Unfortunately, a 20-year-cheat does not change his spots very often, and this one did not, continuing to accept payment for work that he did not perform. Moreover, creating the false DMRs enabled him to claim to the GTSA and BNSA that there were no problems at either of the plants. The municipal authorities relied on him because he knew more than they did about sewage treatment plants. His operation of the plants in violation of the NPDES permits subjected them, the permit holders, to CWA liability, a point the GTSA makes in its victim impact statement to the Court. (Exhibit C).

Klepadlo's evaluation of risk is extremely limited. With no one attending the plants for long periods of time, neither Klepadlo nor his expert can say whether Klepadlo was discharging properly treated sewage. That is one reason PADEP required daily sampling. At the

GTSA, six weeks or more sometimes passed before an operator showed up and took an actual sample, whether that was a grab or composite sample.  Failing to show up for most of a six-month period only increased risks at both plants.  Further, the various photos taken between 2013 and 2017 demonstrate that the GTSA plant had operational issues even when Klepadlo and his employee came more frequently.

Failing to show up for most of a six-month period only increased risks at both plants, which Mr. Long ignored.  While Klepadlo claims that the plants were "automated," no electronic system operates without needed human attention.  Sewage treatment plants do not operate on autopilot; they are temperamental at best and require continual attention.  The GTSA and BNSA hired Klepadlo and his firm to provide that needed attention and expertise.  By Klepadlo's own admission, they did not get what they paid for.

V.    **Section 2Q1.2(b)(4), Application Note 8**

The Government incorporates by reference its arguments concerning the nature and quantity of the substances involved and the risk presented by the offense.  Further, the Government notes that

actual harm is not a factor in a Subsection (b)(4), Application Note 8, and analysis; rather, it is the risk from the offense.

Klepadlo is not entitled to a guided departure under either Section 2Q1.2(b)(1) or (b)(4) because he has failed to meet his burden of proof. He generalizes about the lack of harm to the environment, and erroneously claims that the quantity of illegally discharged pollutants was "small."   Klepadlo's expert so limited his focus and analysis that it appears he prepared his report as it the events described in it occurred in a vacuum.   On the other hand, the Government's evidence shows that Klepadlo wantonly discharged at least 8 million gallons of unmonitored wastewater on unmonitored days during the surveillance period from the two plants, and admitted to discharging vast amounts of unmonitored sewage for 20 years at these two plants and others.   The Government's evidence shows his failure to operate and maintain the plant over multiple years, including the very high level of fecal coliform present in the wastewater in December, 2017.   The sample results that day resulted in PADEP requiring GTSA to take corrective action.

Ultimately, Klepadlo's guided departure claims ignore one simple proof issue which he cannot overcome:  Klepadlo has no real data either

for the surveillance period or, for that matter, for the entire period of April, 2013, to December of 2017, to support his broad claim of no environmental harm. He harps about PADEP's failure to do stream sampling (Doc. 70, p. 8-9). However, this is the proverbial straw man because Klepadlo cannot offer one piece of concrete sampling data about his own discharges for at least 4.5 years, if not longer. Even his own expert declined to use his "data." Klepadlo bears the burden of proof – and without meaningful data his expert's opinions about lack of harm are speculative at best. Moreover, the available evidence from repeated on-site visits by PADEP demonstrates the multiple problems Klepadlo had operating them while assuring the GTSA and BNSA that everything was fine.

With regard to the surveillance period itself, Klepadlo falsified data on so many days that trying to extrapolate from DMR data was useless. Klepadlo's own expert implicitly acknowledged that fact by not using ANY of Klepadlo's DMR data ever submitted for either of the two plants, except, inexplicably, one month's data from November of 2017 at GTSA. Instead, Mr. Long relied on nine samples collected from the two plants over a period of several years, even where PADEP took grab

samples and the permits required composite sampling.   If Klepadlo's expert cannot rely on Klepadlo's data in making a guided departure argument, Klepadlo cannot make out even a prima facie case for guided departures.

Finally, considering the broader relevant conduct, the record is replete with documentary evidence, including photos attached to the Government's initial Sentencing Memorandum, showing the effects of improper operation and maintenance at the plant from 2013 to 2017. These include photos showing condoms and tampon applicators at the discharge point and the presence of fungus and bloodworms that are indicators of improperly treated sewage being discharged into the tributary of Dundaff Creek.  (*See* Doc. 40, Exhibits 1.1 – 8.4). Discharging poorly treated sewage is not the kind of activity meant to be encompassed in applying the guided departure.

## VI.   §§ 3B1.1, 3B1.3 Do Not Overstate the Seriousness of the Offense

In his initial Sentencing Memorandum, Klepadlo acknowledged that the enhancements for Role in the Offense and Abuse of Position of Trust/Use of Special Skill applied.  But he argued that they overstated

the seriousness of the environmental offense.  This claim illustrates the very different views of Klepadlo's conduct over many years.

Klepadlo is the owner of DKA.  He was the decision maker in all company operations, including contracting with the GTSA and BNSA. He made all day-to-day decisions about staffing and job assignments involving the work for these two municipal entities.  Klepadlo dealt with GTSA and BNSA at a managerial level, and was totally responsible for all failures to perform the contracts.  He kept the two Authorities apprised of issues concerning plant performance, or, at least he was supposed to do that.  Klepadlo further admitted that neither he nor his employee were doing daily sampling or checking on plant performance, and that he was okay with that.  His employee knew he was okay with that.  The fact that the employee might not tell the owner that he was not going to the plants is not surprising given Klepadlo's cavalier attitude.  Klepadlo set the tone, so he should not now complain that his role in failing to take samples or ensuring that his worker did so, having them analyzed, and submitting data that he knew had been made up, overstates the seriousness of his Role in the Offense.

The same is even truer for Abuse of Position of Trust.  Klepadlo is a long-time licensed professional engineer and wastewater treatment plant operator.  No one at either GTSA or BNSA had his expertise to question his judgments about performance of the contracts and the plants, and had no reason to suspect that he was not performing the tasks required under contracts Klepadlo had negotiated with them.  He had a direct fiduciary duty to his clients, one he violated for years by his own admission.  When it came to wastewater treatment at these two plants, he was the MAN – no ifs, ands or buts.  It was only when the GTSA fired him in January, 2018, and hired a very experienced wastewater treatment engineer that it learned about the true state of affairs at its plant.

VII.  **Section 3553(a) Factors**

Despite his guilty plea, Klepadlo continues to shift blame for his legal woes on his employee whom he paid and supervised, or at least was supposed to supervise.  This is true with regard to his environmental misconduct and, remarkably, obstruction of justice.  In his sentencing memos, he accused the employee of hiding illnesses from him, failing to tell him that he was not going to the plants, lying to

34

federal authorities, and claiming to have engaged in tampering with a witness in order to help out a worker. (See Klepadlo's Sentencing Memorandum, 9/27/19, Sealed; Defense Objections to the PSR). In his letter to the Court, dated September 25, 2019, Klepadlo spent one of the 2.5 pages discussing problems with his employee.

The facts tell a different story. As the owner of DKA, Klepadlo was responsible for ensuring that the employee showed up and did his job, was responsible for ensuring he had sufficient staff to attend to each plant daily, regardless of his personal opinion about whether daily or weekly composite sampling was necessary, was responsible for delivering the services the two municipalities paid him to do, and, of course, complying with the law. Klepadlo possessed the most education, training and work experience concerning the design, installation and operation of POTWs, and thus he cannot hide behind claims that his worker somehow caused his problems. Klepadlo, and Klepadlo alone, is responsible for his conduct, and is responsible for his employee as the supervisor of an employee who did his bidding without question. Moreover, Klepadlo admitted to PADEP inspectors that for at least two decades he knew the required daily samples were not being taken

because in his view, they were not necessary, no matter what the NPDES permit required.

These claims about his worker underlie his repeated claim that he pled guilty as the "responsible corporate officer" for DKA or because he provided "inattentive oversight" of his worker and the plants.  In effect, Klepadlo seeks to deny that he had personal and direct responsibility for the charged CWA offenses, including the one to which he pled guilty. The responsible corporate officer doctrine is rooted in the CWA, *see* 33 U.S.C. § 1319(c)(5).  However, it is not a claim based on vicarious liability.  Indeed the facts here with regard to Count 4, facts which Klepadlo has not contested as set forth in paragraphs 12-13 of the PSR, make clear he signed the DMRs as the person designated by his clients as having the authority to do so on behalf of them, the permittees. Klepadlo knew the DMRs were false, and he signed and submitted them month after month after month, year after **year after year.**

### Disparate Sentencing Argument

In his original sentencing memorandum, Klepadlo cites 23 prosecutions involving CWA false statement offenses without providing much in the way of facts about each one to see if they are truly similar.

36

However, they do not appear truly similar.  The summary provided by Klepadlo for each of these cases does not contain any mention that the defendants in those cases obstructed justice.  A defendant similarly situated to Klepadlo would be one who committed both environmental offenses <u>and</u> obstruction of justice.  Klepadlo's comparison claims effectively attempts to reduce the obstruction of justice conduct in this case to a mere footnote.

The Government has not undertaken a factual analysis of all the cases.  However, Special Assistant United States Attorneys Martin Harrell and Patricia C. Miller, both of the EPA Region 3 (Mid-Atlantic) legal office, served as Special Assistant United States Attorneys (SAUSA) on some of the listed cases.  They provide the Court with the following information about those prosecutions.

Ms. Miller represented the Government in the investigation of Matthew Brozena, his company, MAB Environmental, and three employees – Stephen Fritz, James Crafton and James Wetzel.  Fritz and Crafton pled to one count of making a false statement in violation of 18 U.S.C. § 1319(c)(4).  Brozena and Wetzel pled to negligently violating a NPDES permit, a misdemeanor not a felony.  Brozena,

Wetzel, and Crafton were licensed by PADEP as wastewater treatment plant operators. The charges involved wastewater discharges at a small trailer park, a nursing home and a chicken processing plant. All three lower-level employees falsified sample results in lieu of sampling, or changed lab results, and the two certified operators submitted DMRs that they knew contained false sample results. Unlike Klepadlo, all three cooperated early in the investigation and did not obstruct justice. Unlike Klepadlo, the company owner, Brozena, pled to a CWA misdemeanor offense involving a CWA permit charge and did not obstruct justice.

Ms. Miller also served as a SAUSA in *United States v. Shtompil*, (EDPA 2:12-cr-11). The defendant was the director of operations at a manufacturing plant in Philadelphia that discharged process wastewater to the City's sewer system. He and others at the company diluted compliance monitoring samples to obtain results closer to or within CWA pretreatment permit limits imposed by federal and municipal regulation. There was no evidence of disruption of the City's treatment plant, unlike Klepadlo's effects on his POTWs in this case.

SAUSA Harrell, Ms. Miller's supervisor at EPA, represented the Government in the investigation of illegal discharges to the City of Wilmington's sewer system from a used oil refinery in Wilmington, Delaware.  This involves the prosecution of two of the cases cited by Klepadlo: John Lowery and Lance Charen.  Lowery, the lead plant operator, cooperated early in the investigation, pled guilty to conspiracy to violate the CWA, and did not obstruct justice.  As for Charen, he served as the second-level manager for the large, international environmental services firm that owned the Wilmington facility. Charen pled guilty to  conspiring to violate the CWA and to shipping a large quantity of hazardous waste as non-hazardous waste to South Carolina from Wilmington shortly after federal agents executed a search warrant regarding the CWA issues.  There, the City believed that the plant's discharges caused problems at the treatment plant itself.  The company was the second-largest discharger to Wilmington's sewer system.  The Government sought two years in prison; the court sentenced him to one year.  A corporate defendant paid the City more than $2 million dollars in restitution.

All of the discussion about guideline issues involving the environmental aspects of this case runs the risk of obscuring what should be a principal focus at sentencing – Klepadlo's admitted witness tampering and his post-indictment attempt to contact the witness. Klepadlo was indicted on two counts of obstruction of justice representing two attempts to tamper with a witness, and he pled guilty to one count.  Klepadlo attempts in his sentencing memoranda and in his letter to the Court to provide "context" for his conduct, *i.e.,* his efforts to help his employee.  The recorded telephone calls between Klepadlo and his employee belie that explanation.  To the contrary, Klepadlo instructed the witness to feign ignorance, to claim that a retired DEP inspector said it was okay not to sample each day, and to say repeatedly that he did not recall.  PSR ¶ 15.  Furthermore, Klepadlo was arrested after being indicted and, at his initial appearance, he and the magistrate judge discussed at some length that he could not contact witnesses in the case.  Within hours, Klepadlo contacted the witness and provided him with questions to answer about the case.  PSR ¶ 2. This led to the re-arrest of Klepadlo.

## Respect for the Rule of Law/Deterrence

Klepadlo was a self-professed "arrogant" man.  (Sentencing Memorandum 9/27/19, Sealed, Exhibit A).  His conduct over more than 20 years in falsifying sampling data, disregarding PADEP concerns about his sampling and operational problems, discharging millions of gallons of unmonitored human waste, misleading clients about how their sewage treatment plants were performing, repeatedly telling a witness to lie to government authorities, and disregarding a magistrate's clear post-arrest instruction not to contact witnesses are a testament to the truth of Klepadlo's description of himself.  While he professes to be a changed man, his conduct remains, and it must be punished by more than living at home.  Klepadlo made a good living because of the presence of environmental regulation in the United States.  He abused that trust, and specific deterrence is a must.

The need for general deterrence is also great.  Licensed wastewater treatment plant operators, and the CWA permittees which employ them, are the backbone of water protection in this country. Klepadlo's own citation of some of the many CWA false statement prosecutions nationally is testimony to the recurring nature of illegal

conduct by such operators.  Sending a substantial deterrence message in this case, where Klepadlo is a professional engineer, a licensed operator, and the owner of an engineering and environmental consulting firm who lied to his clients, is required to promote respect for the law and deter others.

The defense argues that Klepadlo never intended to harm the environment.  Very few people act with the conscious desire to harm the environment even if that may be the result of intentional actions.  Here, given Klepadlo's status as a professional engineer, designer of sewage treatment plants, a licensed wastewater treatment plant operator and a person whom communities relied on for professional expertise in serving residents and protecting the environment, there is no question that a prison term should be imposed.

The Government recognizes that Klepadlo has developed health problems since the conduct in this case; however, this is not reason to impose a probationary sentence in this egregious case.   The Government asks the Court to impose a prison term at the bottom of the applicable guideline range – 37 months, and to delay Klepadlo's report date in the discretion of the Court.  As for a fine, the Government

urges that the defendants be ordered to pay a fine jointly and severally of $50,000.

VIII.  <u>Conclusion</u>

The Government respectfully requests that the Court impose a period of imprisonment of 37 months on the defendant, Klepadlo.  The Government also asks that Klepadlo and DKA be fined in accordance with their ability to pay a fine, which appears to be significant, and requests a fine in the amount of $50,000.

Respectfully submitted,

DAVID J. FREED
United States Attorney

<u>/s/ Michelle L. Olshefski</u>
MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney
Atty ID No. PA 79643
Michelle.olshefski@usdoj.gov

<u>/s/ Martin Harrell</u>
MARTIN HARRELL
Special Assistant U.S. Attorney
WV1609
Harrell.Martin@epa.gov

235 North Washington Avenue
Scranton, PA  18503
(570) 348-2800

Date: September 18, 2020